**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMANDA LUND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: 1:20-CV-00098 |
| v. | ) |
| | ) |
| MIDWEST POST ACUTE CARE, PLLC | ) Jury Trial Demanded |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff Amanda Lund ("Plaintiff" or "Dr. Lund"), by and through her undersigned attorneys, Medina Orthwein LLP and Case + Sedey LLC, for her complaint against Defendant Midwest Post Acute Care PLLC ("MPAC," "Defendant," or the "Company"), states as follows:

## NATURE OF ACTION

1.      This is an action for violations of federal and Illinois pregnancy accommodation, anti-discrimination, whistle-blower, and anti-retaliation laws.  MPAC retaliated against Dr. Lund for raising concerns about MPAC's billing policies related to Medicare, compliance with patient care laws, and discriminatory policies regarding pregnancy.   Additionally, MPAC discriminated against, refused to accommodate, and unlawfully terminated Dr. Lund because of her gender, her pregnancy, and her protected activities.  Dr. Lund alleges upon knowledge concerning her own acts and upon information and belief as to all other matters.  By this action, Dr. Lund seeks, inter alia, compensatory damages, restitution, punitive damages, and attorneys' fees and costs, and interest thereon.

1

**THE PARTIES**

2.       Plaintiff Amanda Lund is a triple board-certified Doctor of Medicine in internal medicine, geriatrics, and palliative care.  Dr. Lund is an expert in her field and is highly sought-after due to her experience in geriatrics, a specialty in which demand for expertise far exceeds supply.  She completed a two-year fellowship post-graduation, is published in her field, and has practiced and taught Palliative and Geriatric medicine in a variety of health care settings.  Before MPAC, Dr. Lund worked as the Associate Medical Director and Lead Palliative Physician at Presence Saint Francis Hospital, where she chaired the ethics committee, served on the hospital's institutional review board for clinical research, and taught medical residents.

3.       Dr. Lund worked as the Medical Director for Defendant MPAC from April 2017 until her unlawful termination in October 2018.

4.       Defendant MPAC is an Illinois limited liability company organized in 2014. MPAC has 19 medical offices located in 4 states and 14 cities in the USA and employs approximately 90 health care providers.  MPAC partners with providers of post-acute healthcare services and supplies healthcare providers to service residents and patients.

**JURISDICTION AND VENUE**

5.       The Court has original subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims that arise under the laws of the United States, namely, Title VII, 42 U.S.C. §§ 2000e *et seq*., including the Pregnancy Discrimination Act, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

6.       The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal-question claims that

they form part of the same case or controversy.

7.      Venue is proper in the Northern District of Illinois, Eastern Division, under 28 U.S.C. §1391(b), as MPAC is headquartered in Chicago, Illinois, and a substantial part of the events or omissions giving rise to the claim also occurred in Chicago.

8.      On July 29, 2019, Dr. Lund timely filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR").  On October 17, 2019, Dr. Lund received from the EEOC a Notice of Right to Sue.  On November 18, 2019, Dr. Lund received a Notice of Dismissal and Order of Closure from the IDHR.  Dr. Lund therefore administratively exhausted all her claims that require exhaustion before filing this Complaint.

9.      This Complaint is filed within 90 days of Dr. Lund's receipt of the Notice of Right to Sue from the EEOC and the IDHR Notice.

## FACTUAL ALLEGATIONS

### A.      Dr. Lund's Employment History

10.      In early 2017, MPAC's then-Chief Medical Officer, Cherrie Gilleon ("Dr. Gilleon"), and then-Chief Executive Officer Jason Shaw ("Mr. Shaw") aggressively recruited Dr. Lund for months before Dr. Lund made the decision to join MPAC.  When Dr. Lund accepted the position, she was given the title of Medical Director, a leadership role reporting to the CEO, CMO, and COO, and providing operational guidance in clinical services.

11.      Dr. Lund was specifically tasked with creating a palliative care program, which would provide a highly valued service in the post-acute care setting.  During her tenure at MPAC, Dr. Lund worked long hours, served as MPAC's attending physician and on-call physician for nine

months without additional compensation, and provided necessary compliance review for the Company.

12. Dr. Lund joined MPAC at the early stages of the Company's expansion and, as a result, many of the agreements between Dr. Lund and the Company were verbal assurances from MPAC leadership. For instance, Mr. Shaw and Dr. Gilleon promised Dr. Lund that MPAC would provide her with a fully paid three-month maternity leave, a promise Mr. Shaw repeated throughout Dr. Lund's employment, and as late as June 2018. Both Dr. Gilleon and Mr. Shaw repeatedly assured Dr. Lund that she would not only be supported during her pregnancy, but that she would receive full pay coverage during her maternity leave from the Company. Sadly, and to great detriment to both Dr. Lund and her family, the Company failed to live up to its promises on both fronts.

**B.      Dr. Lund Regularly Reported on the Company's Illegal and Unethical Practices of Putting Profits Before Patients**

13. In the course of Dr. Lund's hire and early tenure, MPAC's then-CEO often relied on Dr. Lund to provide oversight on Medicare compliance for the Company because MPAC failed to hire a Compliance Officer. Dr. Lund was particularly well suited to identify and raise concerns about MPAC's compliance: she is an expert in Medicare requirements who provides Medicare compliance analysis as a consultant to academic medical centers, in addition to her responsibilities in previous positions. Dr. Lund took these duties seriously and worked diligently throughout her time at MPAC to raise concerns with the Company when she believed there was a problem.

14. For instance, in September 2017, Dr. Lund reported problems with billing practices related to MPAC's use of social workers instituted by then Chief Operating Officer, Timothy Martinez ("Mr. Martinez"), which were not in line with Medicare regulations. Mr. Martinez instituted a practice of billing Medicare for MPAC social work services when the rehab centers

and nursing homes with which MPAC partnered were already being paid for social work services through Medicare as part of bundled services. Mr. Martinez, in other words, wanted MPAC to double dip Medicare payments for social workers to maximize MPAC's profits.

15.     Dr. Lund knew that these practices amounted to Medicare fraud, which she refused to participate in. She swiftly informed Mr. Shaw and Mr. Martinez of the problems with the billing practices and encouraged them to make changes to bring MPAC into compliance.

16.     In response to Dr. Lund's concerns about the Company's plan to commit Medicare fraud, Mr. Martinez told Dr. Lund that he "never takes no for an answer" and that he would not be where he was professionally if he did so.[1] Despite Dr. Lund's reporting, MPAC continued these unlawful billing practices for the next three months. During this period, Dr. Lund continued to inform her superiors that their actions violated Medicare billing and anti-fraud laws, in addition to Illinois licensing requirements for her medical license, refused to participate in the unlawful billing scheme, and continued to advocate for outside review by compliance specialists.

17.     MPAC only changed these practices reluctantly when two separate health care attorneys hired by MPAC – the second hired after MPAC did not like the answer provided by the first attorney – agreed with Dr. Lund and found them to be deficient.

18.     After outside counsel confirmed that Dr. Lund had been right to object to MPAC's billing practices, then-CEO Shaw praised Dr. Lund for bringing the Company into compliance. Mr. Shaw then also suggested that Dr. Lund report directly to him, rather than to Mr. Martinez, to prevent escalating conflict between Mr. Martinez and Dr. Lund. Mr. Shaw told Dr. Lund that Mr. Martinez was unwilling to engage with Dr. Lund because he was frustrated with her reporting on

---

[1] Mr. Martinez also regularly stated that sometimes it was important to "break things" in order to achieve results, despite the highly regulated nature of health care services.

the Company's compliance issues. There was, in other words, no doubt about Mr. Martinez's intentions: he had begun to retaliate against Dr. Lund precisely because of her complaints about the Company's billing practices.

19.     In January 2018, Mr. Martinez requested that Dr. Lund temporarily assume the attending physician responsibilities at Lutheran Home,[2] including responsibility for over 100 patients, while the Company searched for a replacement attending physician. Dr. Lund agreed to the appointment, and the dramatic altering of the job responsibilities that brought her to MPAC, with the explicit agreement that it would be temporary. However, rather than honor the agreement for a temporary move, MPAC required Dr. Lund to serve as the sole attending physician on staff for MPAC at Lutheran Home for the next nine months, in addition to her role as Medical Director, without increasing her compensation.

20.     While serving as attending physician for Lutheran Home, Dr. Lund discovered that MPAC had no on-call physician to cover Lutheran Home's patients during the attending physician's hours off duty. Instead, MPAC was paying nurse practitioners to answer calls during the attending physician's off hours without physician support, again prioritizing profits over patients. Upon learning of these practices, Dr. Lund immediately informed Mr. Shaw that MPAC's failure to provide an on-call physician violated both patient care and scope of practice regulations for nurse practitioners, and resulted in risk for the patients, health care providers at Lutheran Home, and MPAC.[3]

_____

[2] Lutheran Home is an outpatient care center providing services to a senior living community. At the time, MPAC partnered with Lutheran Home to provide medical support staff, including nurse practitioners and attending physicians.

[3] Furthermore, Dr. Lund and her predecessor served as the sole attending physician for all nurse practitioners hired by MPAC, a ratio which far exceeded the standard ratio for nurse practitioner to attending physician.

6

21.     Despite Dr. Lund's complaints, MPAC chose not to ensure adequate on-call support for the next three to four months.  Dr. Lund refused to engage in this breach of patient care and nurse practitioner scope of duty requirements; instead, she made herself available to receive calls during her off hours.  MPAC did not provide Dr. Lund additional compensation for either her additional role as attending physician or for the hours that resulted from her duties as the default on-call physician, although MPAC was well aware of the additional work she was performing due to its failure to provide on-call support.

22.     In or about February 2018, MPAC hired an outside provider, Third Eye, to pilot a program to provide on call telehealth services.  It quickly became apparent, however, that Third Eye did not provide adequate services.  In fact, Third Eye's services were so repeatedly inadequate that Lutheran Home providers refused to work directly with them, and administrators often insisted on working with Dr. Lund exclusively.  Third Eye's lapses in services had serious consequences for Lutheran Home patients, including one who suffered serious and painful burns that went untreated because the Third Eye providers failed to document services properly.  Although Dr. Lund raised concerns about Third Eye's deficiencies with the Company—and complained about her resulting additional duties as physician and on-call physician—MPAC maintained Third Eye as its on call services provider until the time of Dr. Lund's termination.

23.     Dr. Lund continued to advocate for change and compliance within the Company despite MPAC's reluctance to change its unlawful practices.  For instance, in May 2018, Dr. Lund discovered certain violations of State Privacy Laws and Health Insurance Portability and Accountability Act (HIPAA) committed by MPAC's Director of Social Work.  Dr. Lund reported these violations to MPAC leadership immediately.

7

24.     Then in June 2018, Dr. Lund tried to report an adverse patient outcome to MPAC's malpractice insurer, a process that malpractice carriers require.  In response, Mr. Shaw refused to provide her MPAC's insurance information and dismissed Dr. Lund's concerns by saying that Lutheran Home had "deeper pockets" than MPAC and would therefore be the more likely target for a lawsuit.  Mr. Shaw also suggested that MPAC should pick and choose which malpractice incidents they report to the insurance carrier, comparing the situation to car insurance, in which reporting too many accidents leads to insurance rate increases.   Dr. Lund refused to violate the standards of reporting and insisted that MPAC provide the information she needed to report the adverse outcomes.

### C.     MPAC Retaliated Against Dr. Lund

25.      In retaliation for Dr. Lund's protected activities, MPAC began to exclude her from important decision-making meetings to which she had previously been invited and in which a Medical Director would typically be involved.

26.     For instance, in May 2018, Dr. Lund discovered that MPAC was under audit for Medicare billing compliance, though it was already late in the process.

27.     Following their review, the Medicare auditors concluded MPAC had overbilled for nearly 75 percent of the encounters reviewed, because either the documentation did not support the billing rate or the services MPAC provided were not medically necessary.  MPAC was then penalized for this overbilling.

28.     Based on auditor feedback, Dr. Lund created a plan and training for MPAC Nurse Practitioners to be implemented throughout the Company to ensure proper Medicare billing practices.  Rather than adopt Dr. Lund's plan, MPAC, under Mr. Martinez's leadership, instead implemented a plan aimed only at ensuring that MPAC avoid another audit.   Specifically, Mr.

Martinez's revised policies required that providers use premade billing notes as entries to justify billing at high rates and that they achieve a quota for visits, regardless of the medical necessity.

29.     These policies were so out of line with compliance that two of Mr. Martinez's most loyal subordinates reached out to Dr. Lund to express their concern regarding the policies' legality. Dr. Lund promptly reported these concerns to Mr. Shaw, refused to follow Mr. Martinez's unlawful policies, and instead continued to bill appropriately and encourage others to do the same.[4]

30.     Mr. Martinez also regularly held meetings and made staffing decisions that affected Dr. Lund's practice without including her in those decisions, despite her complaints that doing so made it impossible for her to complete her job duties.

31.     On July 19, 2018, Dr. Lund explicitly told Mr. Shaw that she needed her team at Lutheran Home to stay the same until her maternity leave, out of fear that staffing reductions would negatively impact her ability to provide adequate care in light of restrictions imposed by her pregnancy.  Then again, on July 31, 2018, Dr. Lund reported to Mr. Shaw that she was concerned patient outcomes were at risk due to MPAC's unwillingness to provide her with the support she required at Lutheran Home.  That support never materialized.

32.     Dr. Lund then provided email notice to Mr. Shaw that decisions Mr. Martinez made without her input as attending physician and Medical Director adversely affected her ability to perform both roles, and particularly to ensure patient safety and adequate care.  Dr. Lund had extensive communications with Mr. Shaw in which she expressed her concern that Mr. Martinez refused to discuss staffing levels with her, and instead went directly to the nurse practitioners.

---

[4] As a result of these policies, many of the nurse practitioners were forced to choose between following Dr. Lund's physician directives for adequate care and their own financial wellbeing, which was conditioned on the quotas set by MPAC.

33.     On August 16, 2018, Dr. Lund asked for additional nurse practitioner support at Lutheran Home and reiterated her need to be consulted regarding coverage at Lutheran Home. Following her complaint, Mr. Shaw forwarded Dr. Lund's messages to an HR representative, Ann Zostautas.

34.     Two days later, Dr. Lund again stated her concerns that MPAC's decision to ignore her input on patient care was creating negative outcomes for the patients at Lutheran Home and that, rather than heed her concerns, MPAC had retaliated against her.  But the Company again failed to address Dr. Lund's concerns.  Instead, MPAC's retaliation increased when Mr. Martinez began to take over control of the Company from Mr. Shaw in August 2018.

35.     On August 28, 2018, Dr. Lund learned, through staff at Lutheran Home, that Mr. Martinez had announced that MPAC would unilaterally be pulling out of Lutheran Home immediately.  The announcement came just days after Mr. Martinez had assured Dr. Lund that she would be included in all decision-making related to the future of Lutheran Home.   Indeed, on July 12, 2018, Dr. Lund had asked Mr. Shaw whether there were any plans to change staffing at Lutheran Home and was assured that MPAC had no plans to do so.

36.     The Company's proposed plan to end services at Lutheran Home did not provide adequate time for Dr. Lund or Lutheran Home to ensure that an orderly transition could take place. Dr. Lund warned Mr. Martinez that MPAC could not abruptly stop services at Lutheran Home without risking her medical license and violating patient service laws and regulations prohibiting patient abandonment.  Lutheran Home clinical administrators expressed the same concerns and held emergency meetings.

37.     Rather than heed Dr. Lund's warnings, Mr. Martinez moved forward with his accelerated plans for withdrawal from the facility.  Dr. Lund, fearing for patient well-being and

her medical license, refused to follow Mr. Martinez's plan and instead told Mr. Martinez that she would stay on at Lutheran Home in order to meet her obligations and to create a plan for a safe and ethical withdrawal from the facility. Mr. Martinez then agreed to slow MPAC's withdrawal from Lutheran Home but made it impossible for Dr. Lund to do so without risking her own wellbeing or her patients' wellbeing by refusing to provide her with the support staff she needed.

**D.    MPAC Refused to Accommodate Dr. Lund's Pregnancy, And Instead Escalated its Retaliation**

38.    In March 2018, Dr. Lund learned she was pregnant and immediately informed MPAC. As attending physician at Lutheran Home, Dr. Lund was responsible for between 80–150 patients. The size of the rehab center and number of patients forced Dr. Lund to walk long distances during the day and spend long periods of time on her feet.

39.    Dr. Lund asked MPAC leadership early on in her pregnancy to provide accommodations which would reduce the time she spent on her feet and overall clinical hours. She told MPAC specifically that she had suffered a miscarriage in January 2018, and that as a result she would need to be very careful during her pregnancy in light of that history. While the Company provided statements that suggested it supported Dr. Lund in her pregnancy, it failed to modify Dr. Lund's schedule or job duties despite her repeated requests for reasonable accommodations.

40.    Rather than provide those reasonable accommodations, MPAC escalated its retaliation against Dr. Lund and systematically removed what little existing support she did have. Specifically, the Company regularly moved the Nurse Practitioners working with Dr. Lund at Lutheran Home to alternative facilities and refused to discuss these staffing changes with her or review the staffing needs at Lutheran Home. Indeed, MPAC's retaliatory response to Dr. Lund's requests for reasonable accommodations was so pronounced, and made her work environment so

11

difficult, that Dr. Lund believed MPAC was attempting to force her to quit to avoid having to accommodate her pregnancy.

41.     In April 2018, Dr. Lund developed a subchorionic bleed in her uterus.  After seeking treatment, her medical provider told her that she should limit her schedule and reduce stress on her body.  Dr. Lund informed both Mr. Shaw and HR that she would need to be extra careful and would potentially require lighter duty for the next five weeks as a result.  In response, the Company offered her unpaid leave should she need it, but also told Dr. Lund that she would receive support from the Company in assuring a lighter workload.

42.     Despite its verbal assurances, the Company failed to reduce Dr. Lund's work responsibilities or to accommodate her need for lighter duty in any other way.  MPAC refused to engage in an interactive process with Dr. Lund or to provide her with the support she needed to meet her accommodation requirements.

43.     Without accommodations, Dr. Lund continued to walk and stand for long periods of time at Lutheran Home and serve as the on-call physician, which often required that she wake up in the middle of the night and respond to emergency situations.  Dr. Lund was also working regularly at the MPAC office downtown and continuing to see her full patient load.  On May 31, 2018, she developed a second subchorionic bleed, which placed her at higher risk for miscarriage.

44.     As a result, in July 2018, Dr. Lund sent a message to Mr. Shaw reiterating her need for her team to stay the same to accommodate her pregnancy.  Mr. Shaw assured Dr. Lund that he would resolve the matter but failed to do so.

45.     On August 20, 2018, Dr. Lund emailed Ms. Zostautas to inform her formally that she had work restrictions and provided a physician's note detailing the requirements.  In response, Ms. Zostautas provided Dr. Lund the information she requested for short term disability but did

not engage in conversation regarding the specific restrictions Dr. Lund requested to accommodate her pregnancy or how best to ensure MPAC could provide such accommodations.

46.     Later in August, Dr. Lund experienced increased complications with her pregnancy, which her physicians concluded were a result of physical and psychological stress.  On August 30, 2018, Dr. Lund provided MPAC with another note from her medical provider prescribing more stringent work restrictions in light of her advancing pregnancy.  The note specified that Dr. Lund should perform no more than four hours per day of clinical work (which required that she be on her feet and moving), and that she could perform administrative duties for the second four hours in the workday.

47.     MPAC's sole response to the reasonable accommodations that Dr. Lund's medical provider recommended was an email from HR suggesting that MPAC would meet her modification requests.  However, MPAC's actions quickly made clear that, in fact, the Company had no intention of accommodating Dr. Lund's pregnancy.  Indeed, the Company failed to provide Dr. Lund additional coverage or to limit her patient load; thus, Dr. Lund had no way of meeting her pregnancy accommodations while also meeting her ethical obligations and patient care responsibilities.

48.     Over the next two months, Dr. Lund was regularly told one thing regarding staffing coverage and then learned the plan had changed without her input.  For instance, on September 10, 2018, she received a message from the only remaining nurse practitioner at Lutheran Home who was concerned that she was being removed from Lutheran Home within two weeks, in contradiction to the initial plan in place for her to remain at Lutheran Health until MPAC's withdrawal on November 2, 2018.

49.     MPAC's limited support for Dr. Lund became so inadequate and apparent that Lori Nolden, Director of Clinical Operations at Lutheran Home, made a unilateral decision to stop admitting patients to Dr. Lund.  Ms. Nolden told Dr. Lund that she was doing so in an attempt to protect Dr. Lund from being left "high and dry" by MPAC during the late stages of her pregnancy.

50.     Dr. Lund reiterated to MPAC leadership her need for additional nurse practitioner support and reported the negative impact that removing such support would have on her ability to provide care for her patients and to uphold the work restrictions prescribed by her doctor as accommodations for her pregnancy.  For instance, on September 17, 2018, Dr. Lund informed MPAC that removing her support at Lutheran Home would significantly increase the amount of time-consuming administrative and nursing level work that Dr. Lund would have no choice but to take on in addition to her already heavy workload.  Then, on September 20, 2018, Dr. Lund informed Mr. Shaw that she would continue to provide whatever patient care Lutheran Home needed from her so as not to abandon her patients, but that she would need nurse practitioner support to do so in light of the accommodations she required.

51.     Despite these notices, MPAC promptly removed Dr. Lund's last nurse practitioner from providing support at Lutheran Home.  With no other MPAC medical professional at Lutheran Home, and the Company refusing to provide any other support, Dr. Lund was ethically bound to continue to provide care to her remaining patients despite the late stage of her pregnancy.   Further, without nurse practitioner support, Dr. Lund was forced to take on nursing care responsibilities typically covered by nurse practitioners.  Some of these tasks were so unfamiliar to Dr. Lund that she was forced to ask an outside nurse practitioner to support her in completing them.  Similarly, because these responsibilities were new to Dr. Lund, these tasks took her much longer than they would have taken a nurse practitioner.  Thus, Dr. Lund again requested that the Company provide

additional support to meet her and her patients' needs.  But MPAC refused and, as a result, Dr. Lund continued to work at great risk to herself and to her pregnancy—now well into the third trimester—because she cared deeply for, and had ethical obligations to, her patients.

### E.    MPAC Unlawfully Terminated Dr. Lund And Refused to Pay Her What She Was Owed

52.    MPAC's retaliatory campaign and unwillingness to provide accommodations became dire towards the end of Dr. Lund's pregnancy.  On October 8, 2018, when she was beginning the third trimester of her pregnancy, Dr. Lund provided written notice to Mr. Martinez that she was unable to meet the medical restrictions her doctor recommended for her pregnancy and pregnancy-related conditions because of MPAC's refusal to provide her with adequate support staff at Lutheran Home.  Mr. Martinez's only response to Dr. Lund's complaints was to ask her for an accounting of her need for additional support, and to question her progress on yet another project outside of Lutheran Home.

53.    As a result, on the same day, Dr. Lund formally complained to Mr. Martinez that she was being denied reasonable accommodations recommended by her medical provider, that she was being subjected to a hostile work environment created by Mr. Martinez, and that she was concerned that MPAC would be unable to comply with patient safety regulations and requirements should the situation continue.

54.    Mr. Martinez responded to Dr. Lund, three days after her complaint, with a brief, blanket denial of the concerns raised in Dr. Lund's email and a request for a phone call to discuss. Based on Dr. Lund's prior experience with MPAC's disregard of verbal communication she expected to serve as formal notification, Dr. Lund requested that all communication related to her concerns be done in writing.  MPAC ignored Dr. Lund's request.

55. On October 23, 2018, two weeks after her formal complaint to Mr. Martinez, Ms. Zostautas sent a request for Dr. Lund to join a phone meeting with her and Mr. Martinez, purportedly to discuss the future of MPAC. On October 24, 2018, rather than discuss MPAC's future, Ms. Zostautas, with Mr. Martinez on the line, informed Dr. Lund that MPAC was terminating her employment with the Company and that her last day would be December 18, 2018. Ms. Zostautas specifically mentioned Dr. Lund's "acrimony" with MPAC management (i.e. Mr. Martinez) as the reason for her termination. Ms. Zostautas informed Dr. Lund that MPAC could provide her with a month and a half of transition time in November and December during which time MPAC would want Dr. Lund to be on call should any issues arise and use her Company sponsored time to prepare for and take her recertification boards.

56. Following this conversation, Ms. Zostautas sent Dr. Lund another email reiterating that Dr. Lund's employment with MPAC was ending. Dr. Lund received her final check from MPAC in October 2018.

**F.    MPAC's Discrimination and Retaliation has had Dire Consequences for Dr. Lund and her Family**

57. One week after MPAC notified Dr. Lund that she was being terminated, she went into early labor, which was stopped by medical intervention. Dr. Lund, under the impression she should work remotely for the month of November and until her formal termination date in December 2018, informed Ms. Zostautas that she was hospitalized because of early labor. Dr. Lund did not state that she delivered her baby. Ms. Zostautas then informed MPAC's leave benefits agency that Dr. Lund had delivered her baby and placed her on Short Term Disability Leave, without confirming Dr. Lund's status first. Ms. Zostautas did not inform Dr. Lund that she had taken these actions and Dr. Lund did not know that her short term disability leave had begun.

58.     When Dr. Lund was released from the hospital, she continued to work remotely, by making herself available for questions from MPAC staff and working on teaching and training materials, as she understood her job duties required.  Then, on November 12, 2019, Dr. Lund provided MPAC with notice that her doctor had placed her on leave until the scheduled date of her delivery, December 7, 2018.  She also notified the Company that she believed MPAC had discriminated against her because of her pregnancy and requested an investigation into that discrimination.

59.     Ms. Zostautas thereafter failed to provide corrected information to the leave agency, despite Dr. Lund's notice from her medical provider, which stated clearly that Dr. Lund was scheduled to deliver her baby on December 7, 2018.  On November 19, 2018, Dr. Lund contacted the leave benefits provider, MetLife, to discuss paperwork and learned, for the first time, that MPAC had incorrectly informed the Company that she had delivered her baby.  When Dr. Lund corrected the mistake, MetLife canceled Dr. Lund's disability payment.  Dr. Lund then emailed HR to reiterate that she had not yet delivered her baby and to ask the Company to correct the mistake.

60.     Dr. Lund did not receive a paycheck from MPAC on November 26, 2018, when she should have been paid in accordance with the Company's payroll cycle.  When Dr. Lund asked about the missing paycheck, Ms. Zostautas responded that MPAC did not intend to pay Dr. Lund because there was no work for her to perform.

61.     Through its actions, MPAC forced Dr. Lund to contend with the consequences of its retaliation, and correct MPAC mistakes that contributed to her emotional distress, until the final days of her high-risk and medically complicated pregnancy.

62. The consequences of MPAC's treatment of Dr. Lund have been grave and long lasting. Dr. Lund experienced severe physical and emotional distress as a result of MPAC's unwillingness to support her and its unlawful termination of her. Not only was Dr. Lund left with no way to support herself financially during her maternity leave following her termination, she also was forced to search frantically for employment immediately following the birth of her baby.

63. On April 8, 2019, Dr. Lund's son was diagnosed with right sided hemiparetic Cerebral Palsy, caused by damage to the baby's brain during pregnancy, preterm labor, and/or final labor. Preliminary review indicates that injury likely was the result of Dr. Lund's pre-term labor and the subsequent complications. The reasonable accommodations Dr. Lund requested-and MPAC denied-were intended precisely to prevent this pre-term labor.

64. Despite its refusal to pay Dr. Lund and its refusal to provide maternity leave coverage, MPAC claimed in early 2019 that it had not terminated Dr. Lund but had rather placed her on a leave of absence. Based on its repeated assertions that Dr. Lund was only on leave, Dr. Lund sent notice to the Company that she was ready and able to return to work on June 11, 2019. The Company did not respond to her notice and has not reinstated her to her former position.

## CLAIMS FOR RELIEF

### COUNT I
**Pregnancy Discrimination in Violation of the Pregnancy Discrimination Act,
42 U.S.C. § 2000e(k)**

65. Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

66. Dr. Lund was an employee of MPAC within the meaning of 42 U.S.C. § 2000e *et seq*.

67. MPAC denied Dr. Lund her right to equal employment opportunity in violation of Title VII and the PDA's requirement that "women affected by pregnancy, childbirth, or related

medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." 42 U.S.C. § 2000e(k).

68.     MPAC discriminated against Dr. Lund by treating her differently from, and less preferably than, similarly situated men and employees who were not pregnant, and by subjecting her to adverse employment actions because of her pregnancy in violation of Title VII.  The adverse employment actions included subjecting Dr. Lund to increased scrutiny and denying her opportunities for growth as compared to her male and/or non-pregnant colleagues; denying Dr. Lund adequate staffing and resources provided to her male and/or non-pregnant colleagues; and terminating Dr. Lund's employment.

69.     As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

70.     As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment, severe emotional and physical distress, and mental anguish.  Dr. Lund is entitled to recover damages for such injuries from MPAC under Title VII.

71.     MPAC's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Dr. Lund's rights, entitling her to punitive damages.

72.     Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT II
**Failure to Reasonably Accommodate Disability in Violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.***

73.     Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

74.     Dr. Lund had pregnancy-related disabilities for which she required reasonable accommodations.

75.     As described above, Dr. Lund requested and MPAC failed to provide reasonable accommodations for Dr. Lund based on her pregnancy, in violation of the ADA.  The Company's denials of reasonable accommodations included, but were not limited to, failing to engage in the legally required exchange to determine effective reasonable accommodations for her pregnancy, failing to reduce her workload, failing to provide her adequate nurse practitioner support, and failing to comply with her doctor's stated work restrictions.  Such accommodations would not have imposed undue hardship on the Company.

76.     As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

## COUNT III
### Retaliation in Violation of Title VII,
### 42 U.S.C. § 2000e-3(a), 2000e(k)

77.     Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

78.     Dr. Lund engaged in protected activity that included, but is not limited to, requesting reasonable accommodations for her pregnancy, complaining about the unlawful denial of such reasonable accommodations, and raising concerns about pregnancy discrimination.

79.     MPAC retaliated against Dr. Lund, including by terminating her, because of her protected activity.

80.     MPAC also retaliated against Dr. Lund by, among other things, requiring Dr. Lund to perform additional duties without pay, denying her needed support, and removing nurse practitioners who assisted her.

81.     Each of these adverse employment actions materially and adversely changed Dr. Lund's overall terms and conditions of employment.  A reasonable employee would find MPAC's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

82.     MPAC's retaliatory acts against Dr. Lund were a direct and proximate result of her protected activities.

83.     As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

84.     As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment, severe emotional and physical distress, and mental anguish.  Dr. Lund is entitled to recover damages for such injuries from MPAC under Title VII.

85.     MPAC's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Dr. Lund's rights, entitling her to punitive damages.

86.     Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT IV**
**Retaliatory Discharge**
**Illinois Common Law**

87.     Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

88.     Dr. Lund engaged in protected activity by complaining about MPAC's unlawful or improper conduct, which included, but is not limited to, fraudulent Medicare billing practices, violation of professional ethics and regulatory requirements for doctors, including patient abandonment.  When she made these complaints, Dr. Lund reasonably believed in good faith that

MPAC's actions violated state and federal statutes and regulations with Medicare reporting and patient care requirements.

89.     MPAC terminated Dr. Lund in retaliation for these protected activities, in violation of public policy.

90.     MPAC's desire to retaliate against Dr. Lund for her protected activities was a proximate cause of her discharge and of her claimed damages.

91.     As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

92.     As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment, severe emotional and physical distress, and mental anguish.

93.     MPAC's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Dr. Lund's rights, entitling her to punitive damages.

<u>**COUNT V**</u>
**Retaliation in Violation of the Illinois Whistleblower Act,**
**740 ILCS 174/1**

94.     Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

95.     As described above, Dr. Lund refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and MPAC retaliated against her because of the refusal.

96.     Specifically, Dr. Lund refused to participate in fraudulent Medicare billing practices and to conduct her work in violation of professional ethics and regulatory requirements, including but not limited to those pertaining to patient abandonment.

22

97.    MPAC retaliated against Dr. Lund, including by terminating her, because of this protected activity.

98.    MPAC also retaliated against Dr. Lund by, among other things, isolating her, excluding her from meetings, removing her needed staff support, subjecting her to heightened scrutiny, and removing nurse practitioners who assisted her.

99.    Each of these adverse employment actions materially and adversely changed Dr. Lund's overall terms and conditions of employment.

100.    MPAC's retaliatory acts against Dr. Lund were a direct and proximate result of her protected activities.

101.    By reason of the continuous nature of MPAC's retaliatory conduct, which began in September 2017 and persisted throughout her employment, Dr. Lund is entitled to application of the continuing tort doctrine to all violations alleged herein.

102.    As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

103.    As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment, severe emotional and physical distress, and mental anguish.

104.    Attorneys' fees and costs should be awarded under 740 ILCS 174/30(3).

## COUNT VI
**Failure to Reasonably Accommodate Pregnancy, Childbirth and Related Conditions in Violation of the IHRA, 775 ILCS 5/2-102(J)**

105.    Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

106. As described above, the Company failed to provide reasonable accommodations for Dr. Lund based on her pregnancy, in violation of the IHRA, 775 ILCS 5/2-102(J).

107. The Company's denials of reasonable accommodations included, but were not limited to, failing to engage in the legally required exchange to determine effective reasonable accommodations for her pregnancy, failing to reduce her workload, failing to provide her adequate nurse practitioner support, and failing to comply with her doctor's stated work restrictions.

108. Such accommodations would not have imposed undue hardship on the Company.

109. Dr. Lund suffered injury, both economic and otherwise, including emotional distress, as a result of the Company's unlawful denials of reasonable accommodations.

## COUNT VII
### Pregnancy Discrimination in Violation of the IHRA,
### 775 ILCS 5/2-102(I)

110. Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

111. MPAC is an employer as defined by the IHRA, 775 ILCS 65/2-101(B)(1).

112. As described above, the Company discriminated against Dr. Lund based on her pregnancy in violation of the IHRA, 775 ILCS 5/2- 102(I).

113. MPAC discriminated against Dr. Lund by treating her differently from, and less preferably than, similarly situated employees who were not pregnant, and by subjecting her to adverse employment actions because of her pregnancy in violation of the IHRA. The adverse employment actions included subjecting Dr. Lund to increased scrutiny and denying her opportunities for growth as compared to her non-pregnant colleagues; denying Dr. Lund adequate staffing and resources provided to her non-pregnant colleagues; and terminating Dr. Lund's employment.

24

114. As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

115. As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment, severe emotional and physical distress, and mental anguish. Dr. Lund is entitled to recover damages for such injuries from MPAC under the IHRA.

116. Attorneys' fees and costs should be awarded under the IHRA.

**COUNT VII**
**Gender Discrimination in Violation of the IHRA,**
**775 ILCS 5/2-102(A)**

117. Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

118. MPAC is an employer as defined by the IHRA, 775 ILCS 65/2-101(B)(1).

119. As described above, the Company discriminated against Dr. Lund based on her gender in violation of the IHRA, 775 ILCS 5/2- 102(A).

120. MPAC discriminated against Dr. Lund by treating her differently from, and less preferably than, similarly situated male employees, and by subjecting her to adverse employment actions because of her gender in violation of the IHRA. The adverse employment actions included subjecting Dr. Lund to increased scrutiny and denying her opportunities for growth as compared to her male colleagues; denying Dr. Lund adequate staffing and resources provided to her male colleagues; and terminating Dr. Lund's employment.

121. As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

122.    As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment, severe emotional and physical distress, and mental anguish.  Dr. Lund is entitled to recover damages for such injuries from MPAC under the IHRA

123.    Attorneys' fees and costs should be awarded under the IHRA.

124.    Dr. Lund suffered injury, both economic and otherwise, including emotional distress, as a result of the Company's discrimination.

**COUNT IX**
**Retaliation in Violation of the IHRA,**
**775 ILCS 5/6-101(A)**

125.    Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

126.    MPAC is an employer as defined by the IHRA, 775 ILCS 65/2-101(B)(1).

127.    As described above, the Company retaliated against Dr. Lund for requesting reasonable accommodations for her pregnancy, for complaining about the unlawful denial of such reasonable accommodations, and for complaining of unlawful discrimination in violation of the IHRA, 775 ILCS 5/6-101(A).

128.    The Company's retaliatory actions included requiring Dr. Lund to perform additional duties without pay, denying support and removing the only remaining nurse practitioner to assist her, and ultimately terminating her employment.

129.    As a result of MPAC's conduct, Dr. Lund suffered and continues to suffer injury, both economic and otherwise, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

130.    As a further result of MPAC's unlawful conduct, Dr. Lund has suffered and continues to suffer, *inter alia*, impairment to her name and reputation, humiliation, embarrassment,

severe emotional and physical distress, and mental anguish. Dr. Lund is entitled to recover damages for such injuries from MPAC under the IHRA.

131.    Attorneys' fees and costs should be awarded under the IHRA.

## COUNT X
### Intentional Infliction of Emotional Distress

132.    Dr. Lund re-alleges and incorporates each and every allegation contained in paragraphs 1-64 of this Complaint.

133.    As her employer, MPAC held a position of authority over Dr. Lund.

134.    MPAC engaged in conduct toward Dr. Lund which was both extreme and outrageous in that the Company refused to provide her with adequate staff support, regularly changed her staffing levels without discussing these levels with her, attempted to force her to work in conditions which violated her ethical and professional responsibilities and could have jeopardized patient safety, terminated her at eight months pregnant in the midst of pregnancy-related complications, and thereafter refused to acknowledge that they had terminated her.

135.    MPAC had knowledge that Plaintiff was susceptible to emotional distress in that she was pregnant and at high risk of miscarriage.

136.    As an actual and proximate cause of MPAC's outrageous behavior, Dr. Lund suffered severe emotional distress, including anxiety, fear, anger, depression and humiliation and the injuries set forth above.

137.    Dr. Lund suffered injury, both economic and otherwise, including emotional distress, as a result of the Company's retaliation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the following relief:

a.          Wages, salary, employment benefits, and other compensation or benefits denied

to or lost by Plaintiff in an amount in accordance with proof presented at trial;

b.          Compensatory damages to Plaintiff in an amount in accordance with proof presented at trial;

c.          Restitution to Plaintiff;

d.          Exemplary and punitive damages (where available) in an amount commensurate with MPAC's ability to pay and to deter future conduct;

e.          An award of litigation costs and expenses, including reasonable attorneys' fees;

f.          Pre-judgment and post-judgment interest; and

g.          Such other and further relief as the Court may deem just and proper.


Dated: January 6, 2020                         Respectfully Submitted,

**FOR PLAINTIFF, AMANDA LUND:**


Felicia Medina (*Pro Hac Vice* Motion Forthcoming)
fmedina@medinaorthwein.com
Kevin Love Hubbard (*Pro Hac Vice* Motion Forthcoming)
khubbard@medinaorthwein.com
MEDINA ORTHWEIN LLP
230 Grand Avenue, Suite 201
Oakland, CA 94610
Telephone: (510) 823-2040
Facsimile: (510) 217-3580

Kate Sedey (ARDC No. 6300819)
ksedey@caseandsedey.com
Kristin M. Case (SBN 6274676)
kcase@caseandsedey.com
Case + Sedey, LLC
250 S. Wacker Drive, Suite 230
Chicago, IL 60606
Telephone: (312) 920-0400
Facsimile: (312) 920-0800